Good morning. My name is Daniel Goldberg, and I represent the appellants in this appeal. Your Honor, if I may, at the outset, I'd like to reserve three minutes for rebuttal, if that's okay? That's granted. Thank you. The transaction at issue is effectively a joint venture between two biotechnology companies. On the one hand, plaintiff-appellant Eurofins. On the other, defendant-appellee BioAlliance. Essentially, BioAlliance had created a certain intellectual property, or IP, that is a test which is used to evaluate the effectiveness of certain drugs that would be used on patients suffering from HIV and hepatitis B. We are aware of all these facts. Great. What happened in Delaware, if anything, in connection with this transaction? The entire business was based on creating a Delaware entity as the focal point to enter the United States market. When you say Delaware entity, it is incorporated in Delaware. Correct. What other relationship to Delaware is there? The founder and effectively owner and senior executive of BioAlliance, defendant BioAlliance, a gentleman who's also a defendant, Jill Abenard, is a director of that entity. And the reason why it's significant, it's not — it is true that — But he is French. Correct. Has he spent any time in Delaware? Physically in Delaware? I don't know, and that's not in the record, whether he is one way or the other. I'll note that we did request jurisdictional discovery, and that was denied. But the focal point on the jurisdictional analysis is that there are cases, and I submit it's reasonably settled law, that engaging in certain ministerial acts will subject a party to jurisdiction in Delaware, such as? Well, the ministerial acts here were undertaken by Eurofins, right? The paper was signed by Eurofins. That is correct. Do you have anything in the record at all that you can point us to that says that BioAlliance was directing, instructing, demanding, doing anything to say, we want to be in Delaware? In Delaware specifically? Right. Well, the fact that it turned out to be a Delaware entity is the answer to that question, because what is clear in the record? Why does the fact that it turned out to be a Delaware entity say anything about whether BioAlliance directed it to be a Delaware entity? Because the whole transaction was conceived that it would be a joint venture where the two entities, BioAlliance and Eurofins, would come together to create a new entity in the U.S. It is in the U.S., granted. I acknowledge it doesn't say Delaware specifically. Okay. But they agreed that they would create a U.S. entity. Then they created a U.S. entity that was in Delaware. That's the act. When you say they, Eurofins created it, right? What do you have that says BioAlliance? I don't, because they didn't do that ministerial act. They don't. And we don't contend that. What we contend, and I will also acknowledge, there are no cases on this point. There are no cases. To a certain degree, this panel is writing on a clean slate on this one particular issue. What we submit on the jurisdictional point, it's not complicated, and the Court will either agree or disagree, is that if effectively hiring a service to walk down to the Secretary of State's office in Wilmington and file papers, if that's sufficient to confer jurisdiction, it ought to be sufficient to take active control of a Delaware entity to run a Delaware business based on a transaction geared entirely around that Delaware business. And that's what they did. As I note, the Delaware entity, both sides were contributing something. Eurofins, the money. Let me ask you something specific about the statute. 3104C1 of Title X of the Delaware Code. Now, tell me what is there in the record, in the complaint, in the transaction documents, the affidavits, any place in there that shows that BioAlliance had anything to do with selecting Delaware as the place of incorporation or targeting Delaware in any way. I know you've said that that's where it ended up. And you said in your briefing that the fact that Eurofins signed the papers shouldn't be dispositive. And I'm prepared to acknowledge that if that's, you know, if there were other things showing that BioAlliance was pulling the strings, that would be one thing. But I'd really like to know, since part of your argument is pinned on C1, if there is anything at all to show that BioAlliance was directing or instructing or wanting this to be in Delaware. Because I didn't see it if it's in there, but you can show me if there is. No, we'll keep in mind we're at a pre-answer motion stage. But, no, I don't have that. I don't have that. But what I have, Your Honor, what I submit, which still ought to be enough, when the parties come together to create a joint entity, the fact when they agree that the entity is going to be Delaware, that ought to be the legally significant point. Whether it was real. Where does that fit under the statute? Which prong does that satisfy? It would be the act in Delaware. What we contend is that what happened here is substantively no different than the circumstance where a party actually incorporates a subsidiary in Delaware in order to effect a transaction, which the cases hold is enough for jurisdiction. So what we say is what happened here substantively is no different. And, frankly, so says us, is a touch stronger because it wasn't just the ministerial act and they went off and did business elsewhere. BioAlliance actually had a hand in running this Delaware entity. They participated in board meetings. They had one of the two board seats. In France. Pardon? In France. All the board meetings were in Paris except one in New York, right? Correct. The lab was in Michigan. The headquarters was in Iowa. I mean, what's other than filing a paper in Delaware, which your offense did, what does this have to do with Delaware? Well, we have a few things, which I'll come to in a moment, to move off of this, because I can see I'm not making a whole lot of progress or headway here on this point. But no different than in the cases if BioAlliance had done the incorporation and then they went and did the business elsewhere. Everything Your Honor just said would apply there, too. The business could be outside of Delaware. It could have nothing to do with Delaware. The labs could be elsewhere. That would have still been enough. Here, in what kind of case? Yeah, I was going to say, what's your best case for the proposition that that would be enough? I guess I'm still not sure. I'm not sure. Are we under C1 here? There are cases I'm aware of where jurisdiction arises where a vehicle is created, which is part and parcel of a specific transaction, which is itself in dispute. You're trying to say that's this case. That's this case. That's what I'm saying. That's this case. That they created the business based on a Delaware entity. They engaged in the management of the Delaware entity. The dispute is that the allegations are that BioAlliance defrauded Eurofins into entering into this transaction and creating the Delaware entity to do the business. That's the argument. The other prongs to this on the jurisdictional point are that there is the transaction was reflected in a series of contracts, not just one contract. One of the contracts, and granted, yes, it's an ancillary contract, has a Delaware choice of form provision. It's an ancillary contract that BioAlliance is not part of. Well, but it's incorporated by reference into the contract that they did sign. And if you look at page 35 of their appellate brief, Judge, they actually argue, and they're correct, that they can enforce that ancillary agreement. One of the things that Eurofins was contributing to the transaction was it was going to provide the administrative function, the back office function. That was something that BioAlliance insisted on. That's part of the consideration that Eurofins was providing. The way the parties reflected that was they put it in a separate agreement, for sure, but then incorporated it by reference in the main agreement. When you say they incorporated it by reference, it was appended as an exhibit, but the substantive choice of law stuff was nowhere referenced or incorporated into the document, was it? Well, the whole document is incorporated by reference. It's Schedule 9 to the agreement, and there's an integration clause that says the main document and the schedules and exhibits. So your position is, as a matter of law, any time in a business transaction there's a schedule or other document appended that that incorporates by reference all of the substance and the legal effect of the document that's appended? I submit that that's a question of the party's intent, as all contract interpretation is. And what evidence is an intent to incorporate a choice of law from an ancillary agreement that Schedule 9 to the document when the parties agree and acknowledge that they fought over a form selection clause, came to no conclusion and decided not to have one? What they fought over was that they couldn't agree to New York and they couldn't agree to Paris. Right. So they didn't agree. Agreed. They didn't agree. I understand. And I'm suggesting to you that that choice of law, that choice of form provision in the ancillary agreement, is a factor to consider. They couldn't agree on New York. They couldn't agree on France. Everything else points to Delaware. Wouldn't it be a factor only to the extent that it shed some light on what the parties intended? And if the party's clear intent was, look, we're not going to agree on a forum, why would an ancillary document's form selection clause tell us anything? It would be an odd way to reflect your intent, wouldn't it, to say, well, we can't agree on where we're going to be, but let's have a forum selection clause in an ancillary document reflect where we want to be. What I'm suggesting is that – I'm not suggesting that that forum selection clause should operate as a forum selection clause, that it's binding as if it were in the main agreement. What I'm saying is that one of the touchstone analyses for personal jurisdiction is whether a party could reasonably anticipate it being hailed into the court in the forum here by selecting Delaware law, by having a Delaware choice of forum in an ancillary agreement that they argue they can enforce. On page 35 of their appellate brief, they argue that they have the right to enforce this ancillary agreement. They can't pick the provisions they like and then say the ones that are inconvenient, they don't want to know. Could you move on to discussion of Avinard? Please. We don't have much time left. No, I see. I'm concerned as to whether the fiduciary duty claim and whether that's the basis of forum nonconvenience or exactly where does the answer lie with respect to jurisdiction over him? The claims against Mr. Avinard I view, frankly, as our strongest argument on this appeal. He's a director of a Delaware entity. The trial court held that we failed to state a claim because we didn't allege that Avinard engaged in any conduct beneficial to him and harmful to Vir Allianz, the joint venture vehicle of which he was a director. And isn't that a requirement of the loyalty claim? But we do allege it. I agree. But we do allege it. He just, with all due respect to Judge Sleet, he didn't take into account the allegations that we made. We alleged that Mr. Avinard knew of this infringement claim that was represented that didn't exist by this company, Advance. Where specifically do you allege personal benefit to him? He is in what we allege. Where in the appendix? Sure. If you look on pages 19 to 20 of our brief, we detail it. But I can give you specifics right here. The complaint would be. Right. No, that's what I'm saying. That's where we detail the allegations from the complaint. But I will give you that. In paragraph 37 of the complaint, we allege that by concealing the infringement claim, Avinard protected the interests of BioAlliance, which is his company. In paragraphs 91 to 91. How could he protect it? Essentially, I'm out of time. May I complete the question? Yes. Add a minute on, please. The rub of the complaint is that he knew about this infringement claim. If Eurofins had learned of this infringement claim, or if BioAlliance had learned of this infringement claim, it would have torpedoed the transaction. Because the whole deal was that they were transferring in this intellectual property. Eurofins was contributing money to build it out. And he knew, and the allegations are that he knew it was fundamental to the deal. There's a rep in the contract on the lack of such a claim or threat of a claim. So he knew it was important. BioAlliance, by doing this transaction, shifted its indemnification obligations to the venture vehicle. And they've had to pay on that, right? Pardon me? They've had to pay on that. They had to pay on that, absolutely. It destroyed the business. The business is dead, done. I mean, it exists as a corporate entity, but it's not. The business of practical matter is done. So by hiding this infringement claim and letting BioAlliance and Eurofins continue to pour money in, they wasted all that money. How did it inure to his personal benefit? He's an owner of BioAlliance. It's his company. It's his company. BioAlliance, he's a founder. What did it gain? Pardon me? What did it gain by this? It shed the indemnification obligation on the infringement claim. It had licensed the IP to an entity. That entity had indemnification rights to BioAlliance. That's the entity that got sued for the infringement claim. By doing this deal, BioAlliance moved that indemnification obligation from itself to the venture vehicle. Even if this does state a claim, why was the standard of review on the forum nonconvenience is very deferential. Give us 30 seconds of why we would overturn the forum nonconvenience aspect. There's a pretty well-accepted four-part test to forum nonconvenience. The district court didn't review that test at all. The first prong is deference to a plaintiff's choice of forum. These plaintiffs are U.S. citizens of Delaware. But there's a concession that the defendants would agree to jurisdiction in France, and you can't get that in the United States. Well, not as to Avinard. As to Avinard, we do have jurisdiction. If we state a claim, we have jurisdiction by statute in Delaware. But how about the corporation? If we don't have jurisdiction, the issue is moot. If we have jurisdiction, the contacts to Delaware are pretty similar to what I mentioned on the jurisdictional argument. But, Your Honor, as everybody's pointed out, the parties negotiated not to have France or New York as the forum. It would be anomalous to say, okay. Not to agree. Not to agree. They couldn't agree to a forum selection clause, which is a big difference. That doesn't mean they found a court not to find. Well, that is a big difference. No, that's fair. They didn't affirmatively agree that we could never be in France and we could never be in New York. Isn't it fair to assume that since they didn't agree to have a forum selection clause, that what they really agreed was if we get in a fight, we'll just figure it out then? We'll duke it out then. That is what they agreed. There's no doubt. That's what they agreed. No argument about that. But on the forum. I wanted to ask about jurisdictional discovery. What's the focus of your jurisdictional discovery claim? What is it that you believe that you would get if you had the opportunity? I believe that what discovery is likely to show is that entering into this transaction, all parties, including BioAlliance and Mr. Avernard, knew that they would be focusing on Delaware. To your point, you're saying do I have anything in the record showing that they knew that Delaware was going to be the focus, that they chose Delaware? This was a heavily negotiated, heavily lawyered deal. There is no chance that the notion of it being a Delaware corporate vehicle showed up right at the end. I'd like to be able to take that discovery to show that they knew in advance that they were going to be going into the U.S. via Delaware. If I could just ask one follow-up on that. If this was a heavily lawyered deal, and so there was presumably a lot of communication going back and forth between the two sides, right? That's not in the record, but I wouldn't argue with your assumption. So would it also be fair to believe that if there were something where BioAlliance had said, hey, we really want Delaware, that's a great idea, let's go to Delaware, that that's the sort of thing that Eurofins would have in its possession because they'd be the recipients of it in the course of the negotiation? It's surely possible that that's the case. But, Your Honor, keep in mind the standard. This is a pre-answer motion, no hearing. We're not talking about the standard. We're talking about jurisdictional discovery at this point. My question to you is, is it fair to believe that in a heavily lawyered deal, lots of discussion going on back and forth, that if there were a request or an instruction from BioAlliance to Eurofins, we want Delaware, that's something you would have because it would be part of the correspondence leading up to the formation of the entity? Presumably we could have that, Your Honor. But if I had known that we were going to be put to a burden of proving as opposed to alleging, we may have created a different record below. All right. We'll hear from you on rebuttal. Thank you. Thank you, Your Honor. May it please the Court, my name is Joel Friedlander, and I appear on behalf of Appalese, BioAlliance Pharma, Vero Alliance SAS, and Gilles Avenard. I'd like to begin with just three quick points on the record. First, on page A68 of the TTC agreement, it states, this is not a joint venture. It states, notwithstanding anything to the contrary contained in the general agreement or in any other transaction documents, no partnership, joint venture, or other similar arrangement or relationship is being created or shall exist between the parties. And it also states on the first page of that same agreement, on page A58 of the record, the premise, the first background section of the paragraph, first paragraph A of the agreement states, BioAlliance wholly owns Vero Alliance. Eurofins wholly owns EVI. So it's a premise right from the beginning of this contract. Eurofins is on their side. They've created the entity. We have a contract relationship with them. I don't think there's any case on the planet that says that entering into a contract with another party that's formed a wholly owned subsidiary would create jurisdiction, especially since we don't get stock in the entity. We don't even get a stock option in the entity. All we get is a contract right to the future value of the entity if it's successful in generating sales three years hence. Did you have, however, as Mr. Goldberg was saying, a deep involvement, a complete involvement in setting up and deciding how and where this entity, which you were going to be transferring your client, was going to be transferring allegedly valuable IP to, would be operating? I don't believe there's anything in the record about in terms of creating it in Delaware. And not only is there nothing in the record on that point, Mr. Foudon, the chairman of their client, is a former Vero Alliance executive who was on our side of the equation. So not only do they have the documents on their side of the transaction, their principal was our employee before this transaction occurred, and he went over to their side. So in terms of they've never asked for any specific jurisdiction discovery, specifically targeted at anything. And they have one of our key employees on their side of the equation, and there's nothing in the record about us caring, whether it was Delaware or any other particular jurisdiction. When you say they didn't ask for any jurisdictional discovery, they did not ask the court? They asked for complete merits discovery, Your Honor. They asked that even though our jurisdictional brief motion was fully briefed and we'd opposed venue and jurisdiction, they wanted full discovery to go forward. We successfully opposed that, and we think that's part of why this litigation was vexatious and should never have been brought in federal court in Delaware. They're seeking a jury trial. They're seeking punitive damages, full discovery against people in France when there's no convenience to the plaintiffs whatsoever in Delaware as they state in their brief the documents and witnesses are in Luxembourg and Belgium, plus France. Mr. Avenard, at BioAlliance's nomination, did accept a directorship in a Delaware entity, which carries with it, as sophisticated business actors would surely know, a responsibility that might bring you to answer in a court in Delaware, right? Yes, I'm happy to discuss that. So having done that and being, by definition, the representative of BioAlliance to the company, what's wrong with the argument that we've got from the other side that they knew they were going to be in Delaware, they've sent somebody to be their rep to this Delaware company, he's clearly subject to jurisdiction under a specific statutory source, he is their representative in this company. It's fair to hold the companies to account for jurisdiction, just as it's fair and appropriate under the statute to hold Mr. Avenard himself to account under the specific jurisdictional statute. I take that to be sort of the tenor of one of their arguments. Right. If I put it differently, actually there's the absolute requirement in Delaware, of an act in Delaware, and Mr. Avenard is a nominee and is provided for in the contract how that works, which is they, as the parent, the 100% parent of this entity, they choose the directors. There's a contract provision saying that one of the directors is our nominee. So it's a contractual relationship. All we're doing is nominating someone. They have a contractual obligation to make that one person. He just has veto power over certain transactions. There are certain things that cannot be done as a corporate governance matter without his consent. So all we're doing is nominating. If that's contract performance, that's being done in France, this act of nomination. You don't do anything in Delaware to nominate a director. I think you're missing the point of their argument, which I took to be they're acting through Avenard. He's their guy, so what he does is what they're doing. Well, they're only acting through Avenard. Of course, after the entity is created, but he's a director. And I think Judge Sleet made a good point where it says if you're a 100% owner of an entity, if you're a 100% parent of a company, of a Delaware corporation, that does not subject you automatically to jurisdiction in Delaware. Here, all we have is the right to nominate a single director of the company. We don't even formally elect that person. So if you're not, unless you're, by logical extension, if being a 100% owner and having absolute dominion and control over the affairs of a Delaware entity does not subject you to jurisdiction, then nominating a single director pursuant to a contract, I submit, would not submit to your personal jurisdiction either. Now, as far as Avenard, we have the director consent statute, but that's predicated on a claim being stated for breach of fiduciary duty in his conduct as a director. It's limited. You know, there's not a statute saying. Well, there has been a claim stated. And under Paragraph 37, it indicates that his wholly owned company is going to benefit. So why isn't the claim sufficiently stated for purposes of proceeding against him? Because a claim is not stated pursuant to Ashcroft v. Iqbal about whether this, and this is something they've assiduously avoided in their briefs and any discussion of, is that we have a pleading standard in this Court about what meets a duty of loyalty claim or what meets any claim under Rule 8. It's got to be a plausible claim. You have to look to the factual context and the common sense and judicial experience. Why isn't it? What's implausible about saying, Avenard, who the meeting minutes indicate acknowledged was aware of the ABL claim and said nothing about it was saying nothing about it he would scotch the deal that he wanted to go through because he wanted to protect BioAlliance from the patent infringement problems, including the indemnity problems that were going to follow. That's what they're alleging. Why isn't that a sufficient duty of loyalty claim? Two reasons. We're talking about scotching the deal. You know, the entering into the transaction, of course, you know, they're just contract parties. You know, whether to enter into the contract. As a director, two key aspects make this implausible, Your Honor, I submit. One is the economics of the transaction. Can you step back for just a second? Sure. Because I didn't catch that first point. What difference does it make that it's a contract as opposed to something else? It's a deal. I'm sorry. When they enter into this TTC agreement, you know, Avenard is not a director when he's doing that. He's just the counterparty to the contract of the prospective contract. So they have a contract relationship about what has to be disclosed, what's required to be disclosed. He's a contract party, but he's a moving force. He's a control person. I'm sorry. I don't mean to suggest to the contrary. I'm saying the relationship between them is determined by the law of contract and the law of fraud. Avenard is not yet a fiduciary. He's not yet become a director of the new entity. But once he is a fiduciary, once he is a fiduciary, he has, under Delaware law, obligations to disclose information that's, if not disclosed, would be damaging to the corporation, right? Not exactly, Your Honor. And I think this is, and I think Judge Sleet hit it right on the button because the case we cite below was the Big Lots case, the decision by Vice Chancellor Lamb, where she's making very clear this is a very odd species of fiduciary duty claim of what the director's duty of disclosure to other directors. It's only been recognized in the unusual circumstance when a director is actively engaged in a wrong against the company. For instance, usurping a corporate opportunity. Because unlike the usual circumstance when directors act through board meetings or they have general oversight of a corporation. But maybe this is the unusual fact that hasn't been presented yet where he's on both sides of the deal, basically. And there had to be some knowledge that he would be, continue to be involved. I mean, Big Lots. Well, here's the policy reason. And because in Big Lots itself was the circumstance of a director becoming a director of a new entity as a result of a leveraged buyout. And the question was, well, now that you're a director and you know a harmful transaction is coming down the pike, do you have to disclose it? And Vice Chancellor Lamb said no, and said this is quite unlike, Delaware law only recognizes this when you're actively engaged in a wrong against the company. A classic example being the usurpation of a corporate opportunity. And you don't disclose what you're doing. But should this be decided on a 12B6 motion, though? That was. And Big Lots was 12B6. And in federal court, we have the plausibility standard of equality. Big Lots is chronology for a second. Yes. The act that we're talking about, the claim that was asserted against buyout, when was that? You're talking about the ABL, the intellectual property claim? Yeah. I believe in 97. Okay. And so obviously at the time that the contract was negotiated, that was a fact. No, no. I'm sorry. The contract was negotiated in 95. It's about a six- or seven-month gap, isn't it? I'm sorry. Let me back up. I think I misunderstood your question. And let me just bring this back to Judge Jordan's initial question about how about the underlying facts here. The other thing that makes this utterly implausible, other than the economics of the deal where we get nothing up front and only based on our economics are geared to the future success of the company, is that the nature of the allegation is that Mr. Avnart spoke up at a board meeting. And what he said was that in the course of a business negotiation with this ABL in early 95, I'm sorry, early 2005, this other person suggested orally, never in writing, that there might be a need for a license depending on what version of the board minutes you need or that there was a complementary technology. That's in dispute, right? I mean, we have to look at this in the light most favorable to Eurofins. And their assertion is there is documentation. I don't think. Actually, they refer to the oral claims, and they say there's one document reflecting it. But what they're relying on actually are Avnarts, which are incorporated into the complaint, are Avnart statements at these board meetings. And there's a version Avnart signed. There's a version he didn't sign. Even the version he did not sign says Mr. Avnart went on to say that as a negotiating tactic in 2005, Mr. Sciatta alleged that the Vera Alliance business infringed on ABL patents in order to justify making a lower offer for the Vera Alliance assets. And at that time, BA obtained legal opinions, which BA would not make available, that there was no infringement. What I'm suggesting to you is it's utterly implausible to think that something said in a business negotiation and then the business transaction goes away. Now, in fact, we have affidavits about some of the back and forth there that they're for nonconvenience purposes where we actually see the business proposals from ABL, and they don't mention anything about a patent infringement claim. But in the early stages of a business negotiation that then goes away, where someone's just suggesting something orally, then you can say, well, is that a claim under the contract? Has that been a claim in that contract dispute? But is it affirmatively covering up a fraud? Is it plausible that we then entered into this other transaction, you know, thinking that this is some great time bomb, meritorious claim that's been asserted? So the question that I have is at the time that the agreement was entered into, you're saying the best case scenario for your opinion is there's been a discussion at a meeting of a potential claim. There's been a subsequent opinion letter essentially getting rid of that, and it goes away. So that at the time that the contract was entered into, there was nothing to report. Right. And not only that, let me take it one step further, Your Honor, because I think this gets back to Judge Jordan's question, which is when you become a director, there is no case, there's no case even suggesting it. In fact, Big Lots is the contrary that says when you become a director and your company appoints somebody to it, even if it's a joint venture or even some kind of relationship where you have a knowledgeable designee, that there's now sort of this automatic debriefing session. Tell me everything you know about anything that happened to this contract. This is going to be a tough, rough and tumble relationship we have. Tell me everything you know that we could possibly, maybe, assert a breach of contract claim against your employer. And there's no case recognizing anything similar to that. Big Lots says exactly the opposite. Big Lots quotes Chancellor Allen's Hoover decision. Yes. And the specific language in that is the intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned. It self-constitutes a wrong. Now, if we look at this in the light most favorable to your offense, which we are obligated to do, isn't the best case scenario for them, not that there was this minor discussion in the course of the negotiation that went away, but that there was an in writing demand from ABL that there be a license taken or that the infringement types of claims would follow, and that that's something that Avinard and company did not disclose, in fact said the opposite of a matter of months, not years, before this transaction took place. And so that it was fully within the knowledge of Mr. Avinard that ABL could and would make a good on its threat, and that when it did, that would redound to the tremendous detriment of EDI. So that's the pitch they're making. Why wouldn't we say, hmm, we have to take that as the version, given the stage of the proceedings we're at at 12B6? Well, even the best, I think they say there is some document we have no access to, we don't know what it is, but I think they're relying principally on the oral stuff. And we have to take that as true, right? I mean, we're on a motion to dismiss. Because, I'm sorry. Oral versus written really doesn't matter. Well, I would say because the specific facts are, because the oral was in the context of a negotiation, and so that's why I was talking about that, of a deal that then didn't happen, as opposed to being a legal demand letter saying, you know, you're infringing my claim. Still, it's information that he possessed that could be detrimental. Well, my principal response, Your Honor, would be when you say what you have to take as true, let's apply the Iqbal analysis, is that does the factual content take you from conceivable, possible, to plausible? Yeah. So go back to the factual content. You keep spinning it from your perspective. And I'm saying Iqbal or no Iqbal. 12b-6 still says we have to take it as what they're saying is true and every inference on their behalf is true. And then we say, does this create a plausible basis for a claim? So if we take everything they've said is true and every inference on their behalf, as 12b-6 tells us we have to, doesn't that give us a different set of facts from which to assess plausibility than the one that you have pressed? I don't think so, Your Honor, because, frankly, I've been working off, you know, these board minutes which are incorporated by reference in their complaint and even their version of the board minutes, which is what they're principally relying on. If there's one stray reference somewhere to something in writing, it's just maybe there's one. But look at the factual content of the complaint I've been working off completely, which are these board minutes. And I'm saying to you it's implausible because two reasons. The economics of the transaction. What kind of a fraud is it where you get no money up front? You got $10 up front and then a contract right based on the future success of the company three and a half years later. But the plausibility isn't kind of the fact pattern, you know, stranger than fiction. The plausibility is that there's a claim for relief that has the required elements. So, I mean, you know, you can take plausibility to the extreme and, you know, say, you know, this just wouldn't happen. I'm trying to link two things here, Your Honor. I also want you to respond to another thing. You say what kind of a deal is it where you get no money. Their pitch is the deal for BioAlliance was not, hey, we're going to get money. It's we're going to offload liability. That's their pitch. Their pitch is, look, we give these guys the intellectual property and they don't just get our IP for whatever that's worth. They get the indemnity obligations that go with it. And when this ABL suit hits, which is coming, according to them, they're holding the bag, not us. That's their version of the facts. And we don't have any discovery yet. Well, of course, there is an indemnification obligation that we have to them under the contract as well. Is your point on the economics that it does not inure to your client's benefit because if indeed there is a claim, then the underlying economics of the deal make no sense because you ultimately won't, if a claim is asserted against Eurofins and Eurofins has to indemnify, your client can't make any money. Not only can't we make money, Your Honor, not only do we not, we only get the $10 and no future value of the option, this contract obliges us for the next three and a half years to support this. We transfer all the IP, we transfer all the know-how, and we have continuing technical assistance and research that we perform at cost. And that's specified what cost means. We have to provide detailed invoices, detailed timesheets, original copies of expenses, copies of approvals. For three and a half years, we're working to support this, to try to commercialize this entity at cost. Their assertion is that you're commercializing it and keeping it because you're wrongly taking patent rights against it instead of actually dedicating your work to the benefit of the entity. You're doing the work, you're charging the entity for it, and you're holding back the IP that comes from it. That's the allegation that I read. Is that not in their allegations? I'm sorry, but I didn't read it that way because the way the contracts work is we transfer all the IP, we transfer all our know-how, we transfer, we provide the work. We're not allowed to compete with them, so we're not even allowed to be in this line of work. This is a business that we otherwise wouldn't, line of business we're not even engaged in except to support this new entity. And we give them a license and, you know, we transfer to them. Am I wrong about what they're saying has happened in fact? What they say has happened in fact is you may have promised all that stuff, but in the end what you did is you took our money, the cost, you developed product, a new assay, you kept the assay and said, do you want it? You've got to get a license from us, we're getting a patent. That's the allegation. Yeah, the allegation's there, but I would just say under the contracts, if they're right, under the contracts we can't do that. Yeah, but we're dealing with what they're alleging you did. I mean, the fact that it would be a breach of contract, that's their point, that you're breaching the contract. That's one of the allegations they seem to be making. Okay, well, I'm sorry, but I'm trying to go back to the fraud, about whether this is a plausible fraud where, you know, the contracts say what they say. You know, we give them all our intellectual property, we give them the know-how, we support them at cost for three and a half years, we get $10, and we have a promise, a contract formula based on net sales as of 2009. There's this limited option period, and they buy us back out of the option, whatever this contract is, about what the net sales are in 2009. So that's the economics of the deal. And then you have, you know, what's right in the minute, you know, they're talking about this oral suggestion made in a business negotiation six months before, and the question is, then, under Delaware law, because this is a limited claim that's been recognized and discussed in Big Lots, or in Hoover itself, is this covering up a known fraud? In Hoover, it was somebody who's actually stealing things from the company, and the idea was, if a director is stealing from the company, he's subject to jurisdiction because he didn't tell anybody he's stealing. So defalcation, is there extortion, or just taking stuff from the company, or covering up a fraud? The only other case is usurpation of a corporate opportunity, you know, fraudulent self-dealing transaction. Those are the only times it's been recognized, and there's not this idea, we've entered into a contract with you, you have a designee on our board, now tell us everything you know that helps us make out what we think is a breach of contract claim, because this oral insinuation, whatever it is, we say it's a claim under the contract. So you help us out and tell us everything you know to help us establish this is a claim under the contract. You said you had two points about five minutes ago. I did both. One of them was the economics of the transaction. What was the other one? The economics is one. The second is whether the oral suggestion during a business negotiation six months hence, whether that is a knowing fraud as opposed to a colorable breach of contract of what constitutes a claim. All right. Would you address forum nonconvenience for 30 seconds? If the statute says Delaware directors can be sued in Delaware, shouldn't that be taken into account? I think that helps us, Your Honor. Deciding what's convenient or good. I think that helps our argument, Your Honor. They've raised this, and I thought it was interesting. They're saying that Delaware's sovereign interest in establishing a jurisdiction where the Delaware courts can develop Delaware law, and this is Armstrong v. Pomerantz establishing the constitutionality of the director-consent statute, saying the importance of a state forum to develop Delaware law gives them automatic access to federal court where they can sue for punitive damages and try to get a jury trial, things you can't do under state law. And I think it's a perversion of section 31 to 14 to say you can sue a nonresident director automatically in federal court because of a state statute creating jurisdiction in state court. And you get the incentive, oh, you can sue for punitive damages in federal court. So it doesn't create the forum nonconvenience law to recognize that there's not an automatic access to federal court. So not only is there the adequate remedy in France, adequate jurisdiction in France, there's a prac alternative, as Judge Sleet said, so you can always sue them in the court of chancery, which has its own rules about its own interest in providing a forum for the development of the law about what breach of fiduciary duty law means for directors of a Delaware entity. And the overburdened federal court, the overburdened district of Delaware, it shouldn't just be a free option where you can go try to get a jury trial or punitive damages for suits against nonresident directors. So I think it supports us, Your Honor. All right. Thank you. Mr. Goldberg, we gave Mr. Friedlander some extra time, so I don't know. What did we reserve for your rebuttal? Four minutes? Three. Three. We'll give you four minutes. Thank you very much. What's the status of the Paris action? It is in the pre-answer motion to dismiss stage. I understand. Who are the parties in that action? It's pretty much the – Everyone here. Everyone here, plus I think they've also sued the entity that asserted the infringement claim, ABL. And the essence of the claims are everything here and more? Well, the flip side of this case, that's for sure. Whether it's more – I guess it's more because they're asserting what I guess is the French analog to defamation against ABL for asserting the defamation claim. But clearly my point is that everything that is raised here is in that suit. The essence of the claims here. I understand your question. I understand your question. I believe the essence of the claims are there. I can't represent to the court that they're the same. I just don't have that information available to me. Right. It's not up on French law, right? Right, right, right. You know, Your Honor, what Mr. Friedlander told you about the nature of the claims and the way they view the claims, and, Judge Jordan, as you pointed out, that's just not the way we've pleaded them. The way we've pleaded them is that Mr. Avinard, he knew of the infringement claim, and he knew that it was important and it was real to Vera Allianz, and he covered it up. It's not an argument on a 12B6 motion to say the allegations in the complaint are wrong. Why don't you answer the argument that Mr. Friedlander made that at the time the deal was struck, Mr. Avinard had no responsibility to the Eurofins at all. And by the time he did become a director, the deal was what the deal was. And there's nothing in Delaware law, and, in fact, Big Lots indicates to the contrary, that, as he put it, you've got some debriefing obligation once you take a directorship. There is, I agree, the date of closing is a meaningful date here. Prior to the date of closing, he's an arm's-length counterparty negotiating a contract. After the date of closing, he's now a fiduciary. We're not suggesting he had to show up and say debrief me. What we're saying is they defrauded us. When? On the day of contract. On the day of contract. They made a representation in the contract of fact, that there had been no claims of infringement. So when he signs that contract and makes that factual rep, and then the factual rep is also on the date of closing, we also will not have had received any threats of claims of infringement as of the date. So when the deal closes, that's a fraud. So what's the timing? When does he become a fiduciary? Yeah, when was his nomination? Immediately. As soon as the date of closing. It all happened together. All happened together. All happened together. So he's now a director, and he's a fiduciary, and he has knowledge that a corporate entity has defrauded his company that he's a director. And he is conflicted because he's got a conflict of interest because the entity that committed the fraud was him, effectively, because he's the guy who signed the contract. So he knows that his company. What is it that he specifically knows? That this company, ABL, had asserted that the IP that was transferred into this joint venture, what I'm calling a joint venture, which I want to address in a moment, was subject to an infringement claim. Now, when you say subject to an infringement claim, do you agree with Mr. Friedlander's representation, not representation, characterization, that it had been stated that there was a claim, they went back and forth, and it basically went away? If I understood him, that was how he described it. How would you describe him, and how was it described in the complaint? Paragraph 29 of the complaint says, among others, 28 and 29, but 29 specifically, that the claim was asserted orally, and it was also asserted in writing. And the writing we're not allowed to have because when they negotiated their settlement, it was subject to a confidentiality agreement, and BA refused to release the document, BioAlliance refused to release the document under the confidentiality agreement to us. So we don't agree with their characterization. Again, I'm out of time. You have another minute. Thank you, Your Honor. What we say is that the board minutes that reflect what Mr. Avinard said, we don't say he's right. We don't say that's an accurate characterization. What we say is it's proof positive that he knew somebody raised the claim to him before the transaction closed, so he knew about it. He's trying to downplay it as if it was just a negotiating tactic. He didn't take it seriously. Subjectively, he didn't believe it was important or material. Okay, that's something to argue at trial or at summary judgment, perhaps. But we've alleged to the contrary, that he knew it was important, and we allege it in paragraphs 88, 36, 90, 93. We allege it in a multiplicity of places in the complaint. What if we agree you're correct but still believe forum nonconvenience would control? Would we take him out of the forum nonconvenience and say because of the Delaware statute, we think it's important that he should nonetheless be sued in Delaware or be permitted to be sued in Delaware? Yeah, I think that you have to take the claims individually. I think if you're going to, obviously we don't agree, but if you're going to conclude that forum nonconvenience applies to the contract and fraud claims against BioAlliance, that doesn't mean they apply to the breach of fiduciary duty claims to Mr. Avinard, and it would be anomalous to say that a Delaware entity has stated a claim for breach of fiduciary duty against its director, but it must go to France to pursue it. That would be anomalous. How would it be anomalous? Forum nonconvenience is not about the substance of the law. It's about where it makes sense to have a trial, and if one accepts, as Judge Sleet did, that the folks in France will apply Delaware law and give you just as fair a shake as you'd get anyplace, that since the whole kit and caboodle is going down in France anyway, why not have the allegations against Mr. Avinard be dealt with there? Well, a couple points. One is, and to the point I wasn't able to get out, I just ran out of time, that because Delaware law controls here, that's a significant factor, so says us, against transfer on forum nonconvenience grounds in particular because France is a civil law jurisdiction. So now you'd be talking about not just translating the contracts, which are all in English and governed by Delaware law, but every time there's a legal argument, you're going to be talking about translating case law into French to argue to a judge schooled in civil law who is not schooled in common law the finer points of Delaware law on a Delaware fiduciary duty claim brought by a Delaware plaintiff. That would mean that disqualifies France every which way from any suit if you have a problem translating case law. That's going to happen all the time. Well, it's a factor. I submit it is a factor. And here, what you're hearing from the defendants is they're arguing the finer points of big lots and what Vice Chancellor Lamb held in his cases. These are finer points of Delaware law. We're going to reserve that. We're going to tell a Delaware citizen, your claim against your own director is going to be heard in France where you're going to have to argue the finer points of Delaware law to a French judge. It strikes me that that would be anomalous. I appreciate, Judge Jordans, your view that not necessarily, but it seems to me that wouldn't strike me as fair. Just asking questions there, Mr. Goldberg. Understood, Your Honor, understood. I think we are satisfied with the argument, and we thank counsel. Arguments have been very helpful. We'll take the matter under advisement. Thank you very much, Your Honor.